*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

C-SPINE ORTHOPEDICS, PLLC,

      Plaintiff-Appellant,

v

PROGRESSIVE MICHIGAN INSURANCE
COMPANY,

      Defendant-Appellee.

FOR PUBLICATION
December 8, 2022

No. 358170
Macomb Circuit Court
LC No. 2020-001710-NF

---

C-SPINE ORTHOPEDICS, PLLC,

      Plaintiff-Appellant,

v

PROGRESSIVE MICHIGAN INSURANCE
COMPANY,

      Defendant-Appellee.

No. 358171
Macomb Circuit Court
LC No. 2020-000386-NF

---

Before: GLEICHER, C.J., and MARKEY and PATEL, JJ.

MARKEY, J. (*dissenting*).

In these consolidated appeals, plaintiff, C-Spine Orthopedics, PLLC (C-Spine), appeals by right the trial court's orders granting summary disposition in favor of defendant, Progressive Michigan Insurance Company (Progressive), in both cases. The suits involve C-Spine's efforts to collect personal protection insurance (PIP) benefits under the no-fault act, MCL 500.3101 *et seq.*, pursuant to certain assignments executed by persons injured in a motor vehicle accident who received medical treatment from C-Spine. The trial court determined that C-Spine lacked standing to sue. Although I am sympathetic to the view that Progressive should not be allowed to possibly avoid liability for the payment of PIP benefits, the pertinent court rules, statutes, and caselaw, when viewed in conjunction with the facts and procedural history of these cases, demand summary

-1-

dismissal of C-Spine's complaints. Therefore, I would hold that the trial court did not err in granting summary disposition to Progressive. Accordingly, I respectfully dissent.

## I. FACTUAL AND PROCEDURAL HISTORY

As acknowledged by the majority, there are "messy" factual aspects of this case. I believe it appropriate to delve into those facts, because they are relevant to the proper analysis of the issues on appeal. Moreover, these messy facts reveal questionable transactions and form the basis of some wholly meritless and disingenuous appellate arguments by C-Spine.

On May 23, 2018, Jose Cruz-Muniz and Sandra Cruz were injured in a motor vehicle accident.[1] C-Spine provided medical products, services, and accommodations to both Jose and Sandra in relation to their injuries arising from the accident. Progressive was the no-fault insurer responsible for paying PIP benefits with respect to their care and treatment. According to the complaints filed in this case and the attachments to the complaints, Sandra received medical services from C-Spine starting on August 7, 2019, and lasting through December 18, 2019. Sandra's total account balance for C-Spine's treatment and care during that period was $249,258.38. Jose received medical services from C-Spine starting on August 7, 2019, and lasting through October 2, 2019. And Jose's total account balance for C-Spine's treatment and care during that period was $37,667.36.

There is no dispute that Sandra and Jose executed multiple assignments of benefits, authorizing C-Spine to directly seek payment of PIP benefits from Progressive and giving C-Spine the power to pursue and settle claims. This case involves numerous agreements between C-Spine and third-party factoring companies.[2] Those factoring companies included: Well States Healthcare, LLC (Well States); MedFinance Servicing, LLC (MedFinance); Apogee Capital Fund 5, LLC, or Apogee Capital Partners, LLC (Apogee); MMD Investments, LLC (MMD); and EzMed, LLC (EzMed).

The numerous agreements between C-Spine and the factoring companies that are relevant to these appeals are somewhat difficult to navigate and understand because of issues concerning confidentiality and privacy, especially in connection with the Health Insurance Portability and Accountability Act (HIPPA), 42 USC 1320d *et seq.*, along with the fact that C-Spine had entered into nondisclosure agreements with the factoring companies. In both suits, a stipulated protective order was entered in relation to the production and sealing of agreements. Aside from the

---

[1] C-Spine filed a complaint regarding Sandra's accounts receivable in LC No. 2020-000386-NF (Docket No. 358171). And C-Spine filed a separate complaint regarding Jose's accounts receivable in LC No. 2020-0001710-NF (Docket No. 358170).

[2] The business of "factoring" involves "[t]he buying of accounts receivable at a discount." *Black's Law Dictionary* (7th ed). "The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." *Id.*; see also *S & H Packing & Sales Co, Inc v Tanimura Distrib, Inc*, 883 F3d 797, 799 n 2 (CA 9, 2018) (factoring is the commercial practice of converting receivables into cash through their sale at a discount).

assignments between C-Spine and Jose and Sandra, there are effectively four types of documents or transactions in play in these cases.

First, there were bulk purchase and sales agreements between C-Spine and the factoring companies (hereafter "purchase" or "factoring" agreements), pursuant to which C-Spine sold, transferred, assigned, and conveyed its rights, title, and interests in accounts receivable to the factoring companies. No actual purchase agreements concerning Jose's and Sandra's accounts receivable are included in the lower court record. C-Spine did produce a purchase agreement that is contained in the record, but it is dated August 2, 2019, which was before Jose or Sandra began receiving medical services. Progressive describes it as a "sample" purchase agreement, and e-mail correspondence to Progressive's counsel indicated or suggested that all of the actual pertinent factoring agreements had "the exact same contractual language" as the August 2, 2019 purchase agreement. Counter-assignments, purchase-agreement amendments, and schedules of accounts, which I shall discuss below, also referred to underlying purchase agreements.

Second, the record contains some schedules of accounts. The purchase agreements referenced attached schedules of accounts, identifying them as Exhibit A to the agreements. These heavily-redacted schedules of accounts blocked out information about C-Spine patients other than Jose and Sandra. The schedules do show the dates of medical service, the associated charges on those dates, and the discounted amount paid by the factoring companies to C-Spine in regard to those charges. To be clear, because no directly pertinent purchase or factoring agreements are part of the record, the schedules of accounts are not connected to any particular purchase agreements.[3] Rather, C-Spine essentially supplied Progressive with schedules of accounts grouped together that broadly covered all of the numerous purchase agreements that were entered into by C-Spine and the factoring companies.

Third, the record contains several counter-assignments reflecting that C-Spine, under various purchase agreements, had previously sold, transferred, assigned, and conveyed its legal and equitable rights, title, and interests in Jose's or Sandra's accounts receivable to particular factoring companies. The counter-assignments anticipated the need to file suit against the insurer to obtain payment and stated that the best method to do so would be for C-Spine to pursue the action. The counter-assignments thus provided that the factoring companies were now transferring, assigning, and conveying the rights, title, and interests they had previously acquired from C-Spine back to C-Spine relative to medical services provided to Sandra and Jose. The counter-assignments included the right to pursue and settle lawsuits.

Fourth, and finally, the record contains amendments to two Apogee purchase agreements. The amendments acknowledged prior purchase agreements in which Apogee had obtained accounts receivable from C-Spine. The amendments appointed C-Spine as the "servicer" of the accounts receivable consistent with a capacity to litigate and compromise the accounts receivable.

---

[3] There is an exception regarding Apogee schedules of accounts, which can be tied to particular purchase agreements between C-Spine and Apogee. I will discuss it later in this opinion.

-3-

I now move on to the specifics or details regarding Jose's and Sandra's accounts receivable. The record regarding Jose's accounts receivable and related transactions is much clearer than the record concerning Sandra's accounts receivable. Jose received medical services from C-Spine on August 7 and 15, 2019, and was charged $620.46 and $9,651.36, respectively.[4] On August 16 and 30, 2019, C-Spine conveyed accounts receivable to Apogee under purchase agreements, which, in part, encompassed the services provided to Jose on August 7 and 15, 2019. Jose then received medical services from C-Spine on August 21, 2019 ($15,165.34), September 12, 2019 ($5,944.31), September 25, 2019 ($5,864.31), and October 2, 2019 ($421.58). MedFinance acquired all of these accounts receivable pursuant to purchase agreements with C-Spine. By document dated May 4, 2020, C-Spine and MedFinance entered into a counter-assignment of accounts receivable relative to Jose. The counter-assignment indicated that C-Spine had previously sold, transferred, assigned, and conveyed to MedFinance its legal and equitable rights, title, and interests in medical services provided to Jose between August 21 and October 2, 2019. The counter-assignment stated that MedFinance was now transferring, assigning, and conveying the rights, title, and interests it had previously acquired from C-Spine back to C-Spine in regard to accounts receivable associated with medical services provided to Jose. The counter-assignment included the right to pursue and settle lawsuits.

On May 11, 2020, C-Spine filed a two-count complaint against Progressive with respect to services provided to Jose. In the complaint, C-Spine maintained that Progressive had unreasonably refused to make payment for the medical products, services, and accommodations provided to Jose. C-Spine contended that as Jose's assignee, it was the real party in interest and had a right to prosecute the action under MCL 600.2041 ("Every action shall be prosecuted in the name of the real party in interest"). In Count I, C-Spine alleged a claim for PIP benefits. And Count II of the complaint alleged a claim of breach of contractual and statutory duties. C-Spine sought payment of the total account balance with respect to medical services provided to Jose. Post complaint, on July 1 and 23, 2020, C-Spine and Apogee entered into amendments of the August 16 and 30, 2019 purchase agreements, appointing C-Spine as the "servicer" of Jose's accounts receivable consistent with a capacity to litigate and compromise the accounts receivable. Furthermore, it was eventually discovered that the counter-assignment between C-Spine and MedFinance regarding Jose's accounts receivable that was dated May 4, 2020, which date preceded the May 11, 2020 complaint, was actually executed in January 2021, long after the complaint was filed.

Sandra's accounts receivable are more complex and the transactional documents concerning those accounts are more difficult to follow. Sandra received medical services from C-Spine on August 7 and 15, 2019, and was charged $620.46 and $5,994.31, respectively. On August 16 and 30, 2019, C-Spine conveyed accounts receivable to Apogee under purchase agreements, which, in part, encompassed the services provided to Sandra on August 7 and 15, 2019. The preceding mimicked the clear transactions between C-Spine and Apogee relative to Jose. Sandra then received medical services from C-Spine on August 21, 2019 ($6,024.74), September 12, 2019 ($5,918.41), September 25, 2019 (617.05), October 2, 2019 ($9,451.36), October 9, 2019

---

[4] Again, Jose and Sandra essentially immediately assigned their rights to PIP benefits to C-Spine after they received medical services from C-Spine.

-4-

($1,124.10), October 18, 2019 ($13,880.78), October 21, 2019 ($617.05), October 21, 2019 ($617.05),[5] November 1, 2019 ($9,638.93), November 6, 2019 ($421.58), November 15, 2019 ($24,134.72), November 19, 2019 ($136,158.25), November 19, 2019 ($34,039.59), November 20, 2019 (post-op follow-up, no charge), December 5, 2019 (post-op follow-up, no charge), and December 18, 2019 (post-op follow-up, no charge).

As gleaned by e-mails and schedules of accounts supplied by C-Spine to Progressive during discovery, along with documentary references in counter-assignments, Sandra's accounts receivable starting with medical services provided on August 21, 2019, and running through November 19, 2019, were apparently all transferred, sold, assigned, and conveyed to either MedFinance, EzMed, or MMD.[6] But, as discussed below, I am not entirely confident of this factual conclusion.

By document dated January 15, 2020, C-Spine and EzMed entered into a counter-assignment of accounts receivable relative to Sandra. The counter-assignment indicated that C-Spine had previously sold, transferred, assigned, and conveyed to EzMed its legal and equitable rights, title, and interests in medical services provided to Sandra. The counter-assignment stated that EzMed was now transferring, assigning, and conveying the rights, title, and interests it had previously acquired from C-Spine back to C-Spine with respect to accounts receivable associated with medical services provided to Sandra. The counter-assignment included the right to pursue and settle lawsuits. By document also dated January 15, 2020, C-Spine and MMD entered into a nearly-identical counter-assignment of accounts receivable relative to Sandra. And by document dated January 11, 2021, C-Spine and MedFinance also entered into a similar counter-assignment of accounts receivable with regard to Sandra's medical services.

I note that given some ambiguous language in these counter-assignments, it is difficult to connect each counter-assignment to particular dates in 2019 when Sandra received medical services from C-Spine. The MMD counter-assignment pretty clearly spelled out that MMD had purchased Sandra's accounts receivable related to medical services provided to her on November 19, 2019, and that the counter-assignment covered that transaction. The EzMed counter-assignment either pertained to medical services provided "between October 9, 2019 and November 15, 2019[,]" or to EzMed's purchases of Sandra's accounts receivable between those two dates. I find that the dates concerned dates of medical services and not sales because Sandra specifically received treatment on both October 9 and November 15, 2019. Finally, the MedFinance counter-assignment is the most confusing of all. It, like the EzMed counter-assignment, referenced a period of time, "between February 4, 2020 and August 27, 2020," without clearly indicating whether the dates regarded when medical services were provided or when purchase agreements were executed. It is not clear whether Sandra received medical services from C-Spine in 2020, and the complaint

---

[5] There are indeed two listings for October 21, 2019, for $617.05.

[6] I do note that the schedules of accounts showing the conveyed accounts receivable did not appear to include the two $617.05 charges for services provided on October 21, 2019. The trial court treated those accounts receivable as having been transferred by C-Spine, and the parties on appeal effectively accept the court's treatment by ignoring the matter. I shall, therefore, proceed on the basis that those accounts receivable were conveyed to a factoring company.

only encompasses services provided in 2019. Progressive states that the MedFinance counter-assignment covered dates of service "from October 9, 2019 until August 27, 2020." I am unable to discern where Progressive finds the October 9, 2019 date; it is not in the MedFinance counter-assignment. This results in a lack of clarity as to what accounts receivable MedFinance actually purchased from C-Spine in 2019 (and thus which accounts were counter-assigned). And it leaves open the possibility that MedFinance did not first purchase any of Sandra's accounts receivable until February 2020, which, as shown momentarily, was after C-Spine filed its complaint regarding Sandra's accounts receivable. That said, the parties themselves appear to agree that the three Sandra-related counter-assignments covered all of the accounts receivable pertaining to Sandra and medical services that she received in 2019 and that had been sold to EzMed, MMD, and MedFinance. I shall, therefore, proceed on that basis.

On January 29, 2020, C-Spine filed a two-count complaint against Progressive with respect to services provided to Sandra. In the complaint, C-Spine maintained that Progressive had unreasonably refused to make payment for the medical products, services, and accommodations provided to Sandra. C-Spine contended that as Sandra's assignee, it was the real party in interest and had a right to prosecute the action under MCL 600.2041. In Count I, C-Spine alleged a claim for PIP benefits. And Count II of the complaint alleged a claim of breach of contractual and statutory duties. C-Spine sought payment of the total account balance with respect to medical services provided to Sandra. As with Jose's accounts receivable, post complaint, on July 1 and 23, 2020, C-Spine and Apogee entered into amendments of the August 16 and 30, 2019 purchase agreements, appointing C-Spine as the "servicer" of Sandra's accounts receivable consistent with a capacity to litigate and compromise the accounts receivable. Moreover, it was eventually discovered that the counter-assignments between C-Spine and EzMed and C-Spine and MMD regarding Sandra's accounts receivable that were dated January 15, 2020, which date preceded the January 29, 2020 complaint, were actually executed in January 2021, long after the complaint was filed.

On January 19, 2021, Progressive moved for summary disposition under MCR 2.116(C)(5) and (10) in both cases, arguing that C-Spine had assigned its interests in Sandra's and Jose's accounts receivable to the third-party factoring companies and that, therefore, C-Spine lacked standing to bring claims regarding those accounts. Progressive also contended that for purposes of MCR 2.116(C)(10), the documentary evidence demonstrated as a matter of law that C-Spine lacked the legal right to recover any of the charges set forth in the complaints. Finally, Progressive maintained that corporations such as C-Spine do not have the legal capacity to represent the interests of other persons under MCL 450.681, which prohibits the practice of law by corporations. Consequently, according to Progressive, C-Spine lacked the legal capacity to sue on the debts owned by another, i.e., the factoring companies, because it would entail the unauthorized practice of law. C-Spine responded that the agreements with the factoring companies constituted loans and not sales, with the factoring companies merely holding security interests in the accounts receivable. C-Spine also relied on the counter-assignments and purchase-agreement amendments.

The trial court denied Progressive's motions for summary disposition in extensive written opinions and orders that paralleled each other. The court first determined that even though Jose and Sandra had assigned their rights to C-Spine with respect to collecting insurance benefits from Progressive, C-Spine turned around and "sold or assigned its rights in the accounts to the factoring companies." The trial court rejected C-Spine's contention that the transactions between C-Spine

and the factoring companies merely involved loans or grants of a security interest in exchange for capital. The court concluded that under the plain and unambiguous language of the purchase or factoring agreements, the factoring companies became the owners and real parties in interest in regard to the accounts receivable. But the trial court then acknowledged the various counter-assignments, finding that the counter-assignments had re-conferred an ownership interest in the accounts receivable to C-Spine, such that C-Spine again became the real party in interest and had standing to file suit.[7] The trial court additionally opined that enforcement of the counter-assignments did not result in C-Spine's engagement in the unauthorized practice of law on behalf of the factoring companies. Rather, C-Spine had reacquired a full ownership interest in the accounts receivable, leaving the factoring companies with no interest in the accounts. Accordingly, there could be no representative acts by C-Spine in furtherance of interests held by the factoring companies.

Approximately five months later, in June 2021, Progressive moved for summary disposition once again under MCR 2.116(C)(5) and (10). Progressive recounted the procedural history of the cases. Progressive noted that it had been wholly unaware of the counter-assignments and the amendments to the purchase agreements until after Progressive had filed the original motions for summary disposition. Progressive acknowledged that the trial court's earlier rulings on the motions for summary disposition were predicated on the counter-assignments and the dates indicated on the face of those counter-assignments. Progressive observed that discovery was reopened after the court denied the prior summary disposition motions. Progressive stated that after being forced to file several discovery motions and completing a deposition, C-Spine finally disclosed that the counter-assignments had not been created or executed until January 11, 2021. Only one of the counter-assignments accurately contained that date—the counter-assignment pertaining to MedFinance and Sandra's accounts receivable. The other three counter-assignments, on their face, were dated January 15, 2020 (Sandra), January 15, 2020 (Sandra), and May 4, 2020 (Jose), which dates predated the filing of the pertinent complaints. Stated otherwise, those three counter-assignments had been backdated. And Progressive asserted that C-Spine backdated the counter-assignments in an effort to mislead the trial court and to escape the consequences of filing suit absent any real interest at the time. Progressive argued that on the dates that the complaints were filed, C-Spine was not the real party in interest with respect to the accounts receivable and thus C-Spine lacked standing. Progressive also contended that medical services provided by C-Spine more than one year prior to January 11, 2021, were not compensable under the one-year-back rule, MCL 500.3145(2).

In response to the summary disposition motions, C-Spine took the position that while the counter-assignments were indeed executed after the complaints were filed, C-Spine and the factoring companies had "specified the effective dates" as indicated on the face of the counter-assignments. C-Spine further insisted "that the counter-assignments convey standing to [C-Spine] regardless of the date they were signed." C-Spine also supplied affidavits in support of a claim

---

[7] The trial court declined to take into consideration the two Apogee purchase-agreement amendments because the amendments occurred after both complaints had been filed. This leaves me puzzled with regard to the court's denial of the summary disposition motions in full.

that C-Spine retained the exclusive right to sue on the outstanding accounts receivable.[8]  C-Spine asserted that it was and had always been the real party in interest.  According to C-Spine, the factoring companies assigned any rights that they had acquired from C-Spine in relation to the pertinent accounts receivable back to C-Spine, effective on the dates listed in the counter-assignments.  C-Spine additionally argued that should the trial court decide that C-Spine did not have standing when the complaints were filed, the proper remedy was joinder of the factoring companies under MCR 2.205 and not summary dismissal of the lawsuits.

In a reply brief, Progressive contended that C-Spine did not acquire rights or interests from the factoring companies until execution of the counter-assignments and amendments to the purchase agreements, regardless of the so-called selected effective date.  Progressive further argued that standing is determined at the time a suit is filed, that a standing deficiency cannot be cured retroactively, and that the joinder rules had no application under the circumstances presented.

At a joint hearing on the motions for summary disposition held on July 26, 2021, the trial court entertained brief oral arguments by the parties and then ruled in extremely cursory fashion that C-Spine lacked standing at the time that the complaints were filed.  The court noted that "[i]t was done retroactively after."  The trial court granted the two motions for summary disposition in favor of Progressive.  Orders to that effect were entered on July 27, 2021.  C-Spine appeals by right.

## II.  ANALYSIS

---

[8] Mark Seda, Chief Executive Officer (CEO) of C-Spine, averred in an affidavit that C-Spine's agreements with Well States, MedFinance, and Apogee regarding Jose's patient account balance included C-Spine's "obligation to sue for unpaid balances."  In an affidavit executed by Peter Rood, Managing Member of Apogee, he averred that C-Spine owned "the right to sue for any unpaid balance arising out of the treatment to Jose . . . ."  C-Spine also submitted an unsigned and unsworn affidavit by, purportedly, Nate Ormond, President of MedFinance and Well States, in which it was stated that C-Spine owned "the right to sue for any unpaid balance arising out of the treatment to Jose . . . ."  C-Spine additionally submitted similar affidavits from Rood and Ormond with respect to Sandra's unpaid balance.  Indeed, Ormond executed two affidavits on the matter, both fully signed and sworn.  Ormond was President of EzMed, along with being President of MedFinance and Well States.  Jay Bansal, CEO of MMD, executed an affidavit indicating that C-Spine owned "the right to sue for any unpaid balance arising out of the treatment to Sandra . . . ."  Finally, in an unsigned and unsworn affidavit by C-Spine CEO Seda, he supposedly averred that C-Spine's agreements with Well States, MedFinance, Apogee, MMD, and EzMed regarding Sandra's patient account balance included C-Spine's "obligation to sue for unpaid balances."  I note that these affidavits failed to provide context by not referencing any specific or particular agreements.

C-Spine presents six specific arguments on appeal. Those arguments are identical in both cases.

## A. STANDARD OF REVIEW

"Whether a party has standing is a question of law that is reviewed de novo." *Mich Ass'n of Home Builders v Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). "Further, the issue of whether a plaintiff is the real party in interest is a question of law that we review de novo." *Cannon Twp v Rockford Pub Sch*, 311 Mich App 403, 411; 875 NW2d 242 (2015).

## B. ARGUMENT CONCERNING MCR 2.116(C)(5)

C-Spine initially argues that MCR 2.116(C)(5) was not implicated by the arguments posed by Progressive in these cases. C-Spine maintains, correctly so, that MCR 2.116(C)(5) pertains to the "capacity to sue," not standing. A real-party-in-interest defense is not the same as a defense that a party lacks the legal capacity to file suit. *Cannon*, 311 Mich App at 411. An argument that a party lacks "standing" to sue may be raised in a motion for summary disposition under MCR 2.116(C)(8) or (10). *Salem Springs, LLC v Salem Twp*, 312 Mich App 210, 215; 880 NW2d 793 (2015); *Pontiac Police & Fire Retiree Prefunded Group Health & Ins Trust v Pontiac No. 2*, 309 Mich App 611, 621; 873 NW2d 783 (2015). The same is true with respect to a defense that a party is not the real party in interest. *Cannon Twp*, 311 Mich App at 411.[9] In these cases, Progressive sought summary disposition on the basis that C-Spine lacked standing because it was not the real party in interest. Although Progressive cited MCR 2.116(C)(5) in support of the motions for summary disposition, Progressive additionally relied on MCR 2.116(C)(10). Moreover, the trial court's orders granting the motions for summary disposition did not reference any particular ground under MCR 2.116(C). Additionally, "an order granting summary disposition under the wrong subrule may be reviewed under the correct rule." *Limbach v Oakland Co Bd of Co Rd Comm'rs*, 226 Mich App 389, 395 n 3; 573 NW2d 336 (1997), citing *Shirilla v Detroit*, 208 Mich App 434, 437; 528 NW2d 763 (1995). Because the trial court clearly relied on documentary evidence in making its ruling with respect to standing, MCR 2.116(C)(10) was implicated.[10] In sum, I conclude that C-Spine's argument does not warrant reversal.

---

[9] "Both the doctrine of standing and the included real-party-in-interest rule are prudential limitations on a litigant's ability to raise the legal rights of another." *Pontiac Police & Fire*, 309 Mich App at 621-622.

[10] MCR 2.116(C)(10) provides for summary disposition when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion under subrule (C)(10) tests the factual support for a party's cause of action. *Ass'n of Home Help Care Agencies v Dep't of Health & Human Servs*, 334 Mich App 674, 684 n 4; 965 NW2d 707 (2020). A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmoving party, demonstrate that there is no genuine issue with respect to any material fact. *Id.* "A genuine issue

## C. EVIDENCE OF TRANSFER OF INTERESTS BY C-SPINE TO FACTORING COMPANIES

C-Spine argues that there was a complete lack of documentary evidence demonstrating that C-Spine transferred any interests in accounts receivable to the factoring companies. C-Spine initially notes that all of the dates of service were subsequent to the June 11, 2019 effective date of the sweeping amendments to the no-fault act, MCL 500.3101 *et seq*. See 2019 PA 21 and 22. And MCL 500.3112 now provides that "[a] health care provider . . . may make a claim and assert a direct cause of action against an insurer . . . to recover overdue benefits payable for charges for products, services, or accommodations provided to an injured person." C-Spine further observes that on top of the statutory basis to file suit, it had also procured assignments from Jose and Sandra. I note that C-Spine, in its complaints, relied on the assignments of rights from Jose and Sandra for purposes of alleging that it was the real party in interest, absent any mention of statutory rights to directly sue Progressive under MCL 500.3112.

C-Spine specifically contends that there was no record evidence related to any transfer by C-Spine of interests in accounts receivable to MedFinance/Well States, considering that the purchase agreement executed by MedFinance/Well States involved a conveyance by Sea Spine Orthopedic, LLC, not C-Spine. This is a reference to the sample purchase agreement dated August 2, 2019, which reflected a conveyance of accounts receivable by Sea Spine Orthopedic to MedFinanace/Well States. The sample agreement was executed before Sandra and Jose even started treatment with C-Spine. There is no indication that this purchase agreement actually transferred any of the accounts receivable at issue in these cases. Rather, the purchase agreement was provided to Progressive as evidence revealing the general language used in all of the purchase agreements employed by C-Spine and the factoring companies with respect to the conveyances of Jose's and Sandra's accounts receivable. I note that attached to Progressive's appellate briefs is a ratification agreement dated November 8, 2019, which indicates that earlier purchase agreements between Sea Spine and MedFinance/Well States were intended to bind C-Spine and not Sea

---

of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A trial court may not assess credibility, weigh the evidence, or resolve factual disputes, and when material evidence conflicts, it is not appropriate for the court to grant a motion for summary disposition. *Ass'n of Home Help Care Agencies*, 334 Mich App at 684 n 4. "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994). "Affidavits, depositions, admissions, and documentary evidence offered in support of or in opposition to a motion . . . shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion." MCR 2.116(G)(6); see also *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999) (a court may only consider substantively admissible evidence actually proffered by the parties when ruling on a motion).

Spine.[11]  But the ratification agreement was not presented to the trial court as part of the summary disposition proceedings.[12]  Nevertheless, C-Spine's argument fails because the August 2, 2019 purchase agreement referencing Sea Spine was merely a sample agreement that did not entail a transfer of Jose's and Sandra's accounts receivable.  Given the record, C-Spine's argument, in my view, is entirely disingenuous.

C-Spine further argues that the sales of accounts receivable to Apogee, EzMed, and MMD were not established as a matter of law because no purchase agreements were included in the record and therefore the purported transactions effectively remained a "mystery."  C-Spine contends that the mere reference to those purchase agreements in other documents constitutes inadequate proof of the purchase agreements.  Consequently, according to C-Spine, "it is legally impossible to determine who owns the cause of action."  I find this argument to also be disingenuous.  C-Spine provided a sample purchase agreement and schedules of accounts depicting the accounts receivable relative to Jose and Sandra that were conveyed to the factoring companies.  The e-mail correspondence to Progressive that provided the schedules of accounts stated: "I put them in list form—which factoring companies are involved with the patient accounts."  Moreover, C-Spine relied on and had executed counter-assignments and purchase-agreement amendments, which are part of the record, that expressly referred to the purchase agreements.  The counter-assignments and amendments would make absolutely no sense absent the existence of underlying transactions between C-Spine and the factoring companies.

Furthermore, C-Spine does not specifically claim that the purchase agreements do not exist. In fact, in response to Progressive's motions for summary disposition, C-Spine did not deny the existence of the agreements; rather, it characterized the agreements as concerning loans and not sales.  If not waived outright, the argument that there was no documentary proof of the transactions was certainly not preserved.[13]  Regardless, there was uncontroverted evidence establishing that C-

---

[11] There was a Florida entity named Sea Spine Orthopedic, LLC, which was owned by the same owner of C-Spine, A. Joshua Appel.

[12] I note that Progressive also attached to its briefs on appeal a purchase agreement dated September 13, 2019, between Sea Spine and MedFinance/Well States, which paralleled the August 2, 2019 purchase agreement.  But, like the ratification agreement, I could not locate the September 13, 2019 purchase agreement in the lower court record, i.e., it was not attached to any parties' summary disposition briefs in the two cases.

[13] In *Walters v Nadell*, 481 Mich 377, 387-388; 751 NW2d 431 (2008), our Supreme Court explained the rule on unpreserved issues in civil cases:

> Michigan generally follows the "raise or waive" rule of appellate review. Under our jurisprudence, a litigant must preserve an issue for appellate review by raising it in the trial court. Although this Court has inherent power to review an issue not raised in the trial court to prevent a miscarriage of justice, generally a failure to timely raise an issue waives review of that issue on appeal.

Spine entered into purchase agreements with the factoring companies, even though the agreements themselves are not part of the record.

## D. ASSIGNMENT OF BENEFITS PAYABLE IN THE FUTURE

MCL 500.3143 provides that "[a]n agreement for assignment of a right to benefits payable in the future is void." C-Spine points out that Jose and Sandra first received medical services on August 7, 2019, which was after the August 2, 2019 execution of the purchase agreement between C-Spine (Sea Spine) and MedFinance/Well States. C-Spine contends that a right to PIP benefits accrues when an allowable expense is incurred. According to C-Spine, when "an assignment purports to transfer rights to claims that have not yet accrued, any such provision is void and ineffective [under MCL 500.3143] to transfer any rights at all[.]" C-Spine maintains that the August 2, 2019 purchase agreement concerned the assignment of benefits payable in the future, which was void under MCL 500.3143. This argument was not preserved for appeal.

I initially note that C-Spine attaches as an exhibit to its briefs on appeal the August 2, 2019 purchase agreement, followed immediately by schedules of accounts, making it look like the schedules were incorporated exhibits attached to the August 2, 2019 purchase agreement. Once again, the August 2, 2019 purchase agreement was executed before Jose and Sandra were even C-Spine patients—*it was a sample agreement*. Moreover, the schedules of accounts referenced specific dates of service that necessarily had already taken place. It would require clairvoyance for the August 2, 2019 purchase agreement to have covered accounts receivable for future medical services that already had particular dates associated with the services. I would hold that the record, as a matter of law, does not support the conclusion that C-Spine assigned any rights to future accounts receivable to any of the factoring companies.

## E. JOINT PARTIES IN INTEREST

On this preserved issue, C-Spine argues that assignors and assignees are both real parties in interest after rights have been assigned; therefore, the factoring companies and C-Spine were parties in interest for purposes of the litigation. C-Spine, citing MCR 2.202(B), contends that

---

The principal rationale for the rule is based in the nature of the adversarial process and judicial efficiency. By limiting appellate review to those issues raised and argued in the trial court, and holding all other issues waived, appellate courts require litigants to raise and frame their arguments at a time when their opponents may respond to them factually. This practice also avoids the untenable result of permitting an unsuccessful litigant to prevail by avoiding its tactical decisions that proved unsuccessful. Generally, a party may not remain silent in the trial court, only to prevail on an issue that was not called to the trial court's attention. Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute. [Citations omitted.]

"even if the trial court had been correct that [C-Spine] effectively transferred its rights to the benefits at issue, the appropriate remedy is merely to join any other entity that supposedly or allegedly has a duplicative interest in the cause of action." C-Spine maintains that Progressive's sole legitimate interest was avoidance of duplicate payment and that joinder would have protected that interest. C-Spine asserts that the reason for the "real party in interest" requirement is to prevent double recovery and multiple lawsuits. C-Spine claims that the only relief available to Progressive was joinder of the factoring companies, not dismissal of the lawsuit. But then C-Spine also argues:

> In this case, joinder is unnecessary and ultimately inappropriate for any factoring company, given the instruction above that joinder is only necessary where a judgment would not serve as a complete adjudication of the issues asserted or possibly asserted against a defendant. Here, all purported transfers of PIP benefits were executed more than a year ago. To the extent that the factoring companies ever had any interest, it has since extinguished pursuant to MCL 500.3145.[14]

Subject to certain circumstances, "[a]n action must be prosecuted in the name of the real party in interest . . . ." MCR 2.201(B). In *Barclae v Zarb*, 300 Mich App 455, 483; 834 NW2d 100 (2013), this Court observed as follows:

> A real party in interest is the one who is vested with the right of action on a given claim, although the beneficial interest may be in another. This standing doctrine recognizes that litigation should be begun only by a party having an interest that will assure sincere and vigorous advocacy. In addition, the doctrine protects a defendant from multiple lawsuits for the same cause of action. A defendant is not harmed provided the final judgment is a full, final, and conclusive adjudication of the rights in controversy that may be pleaded to bar any further suit instituted by any other party. [Quotation marks and citations omitted.]

An assignee of a cause of action becomes the real party in interest in relation to that particular cause of action, considering that the assignment vests in the assignee all the rights earlier held by the assignor. *Kearns v Mich Iron & Coke Co*, 340 Mich 577, 582-584; 66 NW2d 230 (1954); *Cannon Twp*, 311 Mich App at 412-413; *Burkhardt v Bailey*, 260 Mich App 636, 653; 680 NW2d 453 (2004). This caselaw does not support C-Spine's contention that an assignor remains a real party in interest after an assignment. Indeed, assignments divest assignors of any interest in the subject matter of the assignments. See *Ward v DAIIE*, 115 Mich App 30, 37; 320 NW2d 280 (1982); *Moore v Baugh*, 106 Mich App 815, 819; 308 NW2d 698 (1981); 6A CJS, Assignments, § 88. Critical to the proper analysis of these lawsuits, caselaw provides that standing is determined at the time a complaint is filed. *League of Women Voters of Mich v Secretary of State*, 506 Mich 561, 595 n 54; 957 NW2d 731 (2020); *Girard v Wagenmaker*, 437 Mich 231, 244; 470 NW2d 372 (1991). And C-Spine and my colleagues in the majority do not argue to the contrary.

---

[14] MCL 500.3145(2) provides, in part, that a "claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

In support of its position that assignors and assignees remain real parties in interest after an assignment, C-Spine cites and quotes MCL 600.2041, which provides, in part:

> Every action shall be prosecuted in the name of the real party in interest; but an executor, administrator, guardian, trustee of an express trust, *a party with whom or in whose name a contract has been made for the benefit of another*, *or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action was brought* . . . . [Emphasis added.]

The emphasized language is the language that C-Spine emphasizes when making its argument. Similarly, MCR 2.201(B)(1) provides:

> (B) An action must be prosecuted in the name of the real party in interest, subject to the following provisions:
>
> (1) A personal representative, guardian, conservator, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a person authorized by statute may sue in his or her own name without joining the party for whose benefit the action is brought.

With respect to contracts made for the benefit of another, this is plainly a reference to contracts with third-party beneficiaries, allowing a contracting party who does not receive a direct benefit to file suit if the other contracting party's promise directed at the third-party beneficiary is not fulfilled. See *Capital Mtg Corp v Mich Basic Prop Ins Ass'n*, 78 Mich App 570, 575; 261 NW2d 5 (1977) ("[A] party in whose name a contract has been made for the benefit of another may sue in his own name without joining the other party"). The purchase agreements or assignments to the factoring companies in these cases did not involve third-party beneficiaries. Rather, the purchase agreements between C-Spine and the factoring companies simply entailed C-Spine's straightforward sale of its interests and rights in accounts receivable to the factoring companies in exchange for immediate payment on those accounts at a discounted rate.

With respect to a party being authorized by statute to sue for the benefit of another, MCL 600.2041; MCR 2.201(B)(1), it is true that under the current version of MCL 500.3112, C-Spine was statutorily authorized to directly file a cause of action against Progressive. The majority concludes that C-Spine had statutory standing to bring the claims on the basis of MCL 500.3112. I initially note that even though the amendment of MCL 500.3112 adding a direct cause of action for healthcare providers was in effect, 2019 PA 21, C-Spine's 2020 complaints, as noted earlier, relied solely on Sandra's and Jose's assignments in pursuing the actions and in claiming that it was the real party in interest. "[A]lthough the principle of statutory standing overlaps significantly with the real-party-in-interest rule, *they are distinct concepts*." *In re Beatrice Rottenberg Living Trust*, 300 Mich App 339, 355; 833 NW2d 384 (2013) (emphasis added). Statutory standing is a jurisdictional principle, while "the real-party-in-interest rule is essentially a prudential limitation on a litigant's ability to raise the legal rights of another." *Id*. "[I]f a party lacks statutory standing, then the court generally lacks jurisdiction to entertain the proceeding or reach the merits." *Id*., citing *Miller v Allstate Ins Co*, 481 Mich 601, 608-612; 751 NW2d 463 (2008); see also *Grady v Wambach*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354091); slip op at 3. Jurisdiction is not an issue in this case.

-14-

In *Lansing Sch Ed Ass'n, MEA/NEA v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010), our Supreme Court, overruling several of its earlier opinions, enunciated the principles of standing in Michigan going forward:

> We hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine that is consistent with Michigan's long-standing historical approach to standing. Under this approach, a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.

While C-Spine had a statutory legal cause of action under MCL 500.3112, it chose not to pursue that route, relying instead on the assignments from Sandra and Jose to state a legal cause of action. Regardless, in either case, C-Spine still needed to be the real party in interest when the suits were commenced, and the majority appears to accept that premise.

The majority addresses the real-party-in-interest provision in MCR 2.201(B)(1), holding as follows:

> C-Spine is authorized by statute to bring a first-party no-fault claim, and the plain language of the court rule permits it to do so despite that the action was brought for the benefit of the factoring companies, or for the joint benefit of C-Spine and the factoring companies.
>
> [C-Spine] is "vested with the right of action" against Progressive based on the assignments from the Cruzes, and is "authorized by statute" to sue in its own name under the plain language of MCL 500.3112. That the "beneficial interest" resided with the factoring companies did not eliminate C-Spine as a real party in interest.

In my view, this analysis ignores the fact that C-Spine assigned or sold all of its rights and interests in PIP benefits to the factoring companies before the suits were filed, thereby losing its status as a real party in interest under the authorities cited earlier. The factoring companies became the real parties in interest at that point, although there might have been legal impediments to them filing suit against Progressive.

I additionally believe that the majority's position reflects a misunderstanding of MCR 2.201(B)(1). The provision addresses circumstances in which (1) a fiduciary party sues for the benefit of a beneficiary, ward, or similarly-situated person, (2) a contracting party who executed an agreement sues for the benefit of a third-party beneficiary, or (3) a party authorized by statute sues for the benefit of another person. This third situation, which forms an integral part of the majority's holding through reliance on MCL 500.3112, plainly concerns statutory provisions that

-15-

authorize a party to sue for the benefit of another person. Again, in its complaints, C-Spine did not allege a cause of action or standing under MCL 500.3112, but I shall proceed with my analysis assuming application of MCL 500.3112. As noted earlier, MCL 500.3112 states that "[a] health care provider . . . may make a claim and assert a direct cause of action against an insurer . . . to recover overdue benefits payable for charges for products, services, or accommodations provided to an injured person." This statute simply authorizes a healthcare provider such as C-Spine to sue for its own benefit or on its own behalf, i.e., to recover overdue PIP benefits for its products, services, or accommodations. At most, the statute can also be viewed as authorizing a healthcare provider to sue for the benefit of an injured person, considering that payment by an insurer to a healthcare provider can potentially preclude the healthcare provider from seeking payment from the injured person who enjoyed the benefit of healthcare services. But MCL 500.3112 in no form or manner authorizes a healthcare provider to sue for the benefit of factoring companies or others. Accordingly, MCR 2.201(B)(1) and MCL 600.2041 did not give C-Spine the status of a real party in interest at the time the suits were filed in light of the sales of all of C-Spine's interests and rights in the accounts receivable.

Next, MCR 2.202(B), which C-Spine also relies on in support of its position, provides as follows:

> If there is a change or transfer of interest, the action may be continued by or against the original party in his or her original capacity, unless the court, on motion supported by affidavit, directs that the person to whom the interest is transferred be substituted for or joined with the original party, or directs that the original party be made a party in another capacity. Notice must be given as provided in subrule (A)(1)(c).

In these cases, it appears and the parties accept that C-Spine transferred its rights and interests in the accounts receivable to the factoring companies *before* the complaints were filed and not while the suits were ongoing or continuing. Although the counter-assignments and amendments to the purchase agreements were executed after the complaints were filed, this would provide a basis to join or substitute in C-Spine to a suit filed by the factoring companies, not visa versa, under MCR 2.202(B).

Although C-Spine does not raise an argument under MCR 2.205(A), the majority discusses the provision. MCR 2.205(A) provides, in part, that "persons having such interests in the subject matter of an action that their presence in the action is essential to permit the court to render complete relief must be made parties and aligned as plaintiffs or defendants in accordance with their respective interests." The majority posits that had there been no counter-assignments, Progressive might have had a legitimate concern about facing subsequent lawsuits by the factoring companies; however, according to the majority, in that hypothetical situation, the necessary joinder rule, MCR 2.205(A), would have protected Progressive. I fail to understand this logic. At the time the suits were commenced, which is the timeframe that we must consider for purposes of standing and the real-party-in-interest rule, *League of Women Voters*, 506 Mich at 595 n 54; *Girard*, 437 Mich at 244, C-Spine had fully conveyed their rights and interests in PIP benefits in exchange for compensation, and there were no counter-assignments. Whether under the majority's hypothetical or upon examination of these cases at the time the complaints were filed, necessary *joinder* of the factoring companies would have entailed C-Spine remaining in the lawsuit and being

-16-

joined with the factoring companies, but C-Spine would have *no* interest whatsoever such that it would be entitled to stay in the suit.

The majority concludes that *Cannon Twp*, 311 Mich App 403, supports its position. In that case, the township plaintiff did not suffer any damages or have to pay any monies itself, but it was assigned causes of action against the defendant school system by two other nonparties, with one assignment occurring before the township filed suit and one occurring after the township filed suit. *Id.* at 412. With respect to the post-complaint assignment, "the trial court granted the township leave to amend its complaint to properly reflect that it was litigating as the assignee of both [nonparties,]" and this Court found no error "in the trial court's grant of leave to amend." *Id.* at 412-413. In this case, C-Spine did not request leave to amend its complaints to reflect that it was litigating against Progressive on the basis of the counter-assignments and the amended purchase agreements. The *Cannon Twp* panel also found that with regard to the nonparty who assigned a cause of action to the township *before the lawsuit was filed*, the township could still be considered a real party in interest even though the township was seeking to collect a judgment for the nonparty's benefit. *Id.* at 413. This reasoning does not support C-Spine's position. The township was an assignee of a cause of action before and after it filed its complaint. Here, C-Spine sold its interests and rights to collect PIP benefits before filing the suits.

In sum, I would hold that there is no authority for the proposition that the appropriate remedy for the issues raised by Progressive in its motions for summary disposition was to deny the motions and to order joinder of the factoring companies. Joinder would not have magically transformed C-Spine into a real party in interest.

## F. TRANSFER OF ACCOUNTS RECEIVABLE AND MAINTENANCE OF A CAUSE OF ACTION

C-Spine argues that to the extent that it transferred rights to a factoring company, regardless of when a transfer was made effective, the conveyances were merely of accounts receivable, which is simply a beneficial interest, with C-Spine retaining ownership of any and all causes of action. This issue was preserved for appeal.

I find it telling that C-Spine does not refer to any language in the standard purchase agreement. The purchase agreements, by way of sample, provided that C-Spine was selling, transferring, assigning, and conveying to the factoring companies its legal and equitable "[r]ights, [t]itle, and [i]nterests in the [a]ccounts [r]eceivable." This all-encompassing language plainly and unambiguously covered and conveyed a right of action to recover payment on an account receivable.[15] And any doubt on the issue is put to rest by additional language in the purchase

---

[15] In *Highfield Beach at Lake Mich v Sanderson*, 331 Mich App 636, 654; 954 NW2d 231 (2020), this Court set forth the basic principles of contract construction, explaining:

> The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties; to this rule all others are subordinate. In ascertaining the

agreements regarding servicing, which provides that C-Spine "shall not settle, solicit, or accept collections on any of the [a]ccounts [r]eceivable." Therefore, I conclude that C-Spine's argument fails.

Progressive presents an argument under the Uniform Commercial Code (UCC) – Secured Transactions, MCL 440.9101 *et seq.*, specifically MCL 440.9318(1), which provides that "[a] debtor that has sold an account . . . does not retain a legal or equitable interest in the collateral sold." A "debtor" includes "[a] seller of accounts," MCL 440.9102(bb)(*ii*), and an "account" encompasses "a right to payment of a monetary obligation . . . for services rendered," including "health-care-insurance receivables," MCL 440.9102(b). And "collateral" is defined as "property subject to a security interest[,]" including "[a]ccounts . . . that have been sold." MCL 440.9102(*l*)(*ii*). The UCC article on secured transactions does apply to "[a] sale of accounts," MCL 440.9109(1)(c), and a "security interest" includes "any interest of a . . . buyer of accounts," MCL 440.1201(2)(ii). Editor's note 2 to MCL 440.9318 does state, in part, that "[t]he fact that a sale of an account . . . gives rise to a 'security interest' does not imply that the seller retains an interest in the property that has been sold. To the contrary, a seller of an account . . . retains no interest whatsoever in the property to the extent that it has been sold." I note that the trial court seemingly agreed with Progressive's argument, even though the court primarily focused on the plain language of the purchase agreements. I conclude that it is unnecessary to reach the UCC argument because the plain language of the purchase agreements established that all interests, title, and rights in the accounts receivable were conveyed and that C-Spine could not be involved in collecting on the debts represented by the accounts receivable.

## G. VESTING C-SPINE WITH CAUSES OF ACTION

C-Spine begins its final argument by noting that Michigan law provides that no contract exists unless there is a meeting of minds between the parties to the purported agreement. Relying on the affidavits of the various executive officers of C-Spine and the factoring companies, C-Spine contends that "[r]egardless of the plain language of the agreements at issue, both [C-Spine] and all . . . factoring companies are and always were under the impression that [C-Spine] has the right and, in fact, the obligation to sue to collect PIP benefits." C-Spine continues, arguing that either it was the only real party in interest or there was no contract and thus no conveyance of any rights. Apparently, C-Spine is arguing that either there were purchase agreements consistent with the affidavits or there were no valid enforceable agreements.

With respect to contract formation, "[a] meeting of the minds is judged by an objective standard, looking to the express words used by the parties and their visible actions, not the parties'

---

meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument. Unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written. If the language of a contract is ambiguous, testimony may be taken to explain the ambiguity. [Quotation marks, citations, and brackets omitted.]

subjective states of mind." *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 454; 733 NW2d 766 (2006) (quotation marks and citations omitted). Additionally, parol or extrinsic evidence is not admissible to vary a contract that is clear and unambiguous. *Meagher v Wayne State Univ*, 222 Mich App 700, 722; 565 NW2d 401 (1997). Here, the affidavits cannot be used to undermine or circumvent the plain and unambiguous language of the purchase agreements; there was a meeting of the minds consistent with the clearly expressed language of the agreements. And the executives' subjective states of mind as revealed in their affidavits were irrelevant. The purchase agreements conveyed the right to sue on the accounts receivable covered by the agreements.

C-Spine also argues that Progressive, as a non-party to the purchase agreements, lacked standing to challenge the agreements. This argument lacks merit. Progressive was not suing anyone and did not challenge the agreements. Progressive merely argued that C-Spine lacked standing in light of the purchase agreements. I conclude that C-Spine's argument fails.

III. CONCLUSION

I would affirm the trial court's rulings granting summary disposition in favor of Progressive.[16] C-Spine has not presented any persuasive arguments on appeal. Instead, its arguments, for the most part, are cursory and undeveloped.

I respectfully dissent.

/s/ Jane E. Markey

---

[16] I note that this Court in an unpublished nonbinding opinion similarly found that a factoring agreement deprived a plaintiff of standing. In *Greater Lakes Ambulatory Surgical Ctr, LLC v Meemic Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued July 29, 2021 (Docket No. 353842), p 3, the panel ruled:

> Under the plain and unambiguous language of the sales agreement, it is clear that plaintiff assigned all of its rights in the accounts receivable to the servicing companies. The assignments divested plaintiff of any ownership interest in the accounts. Therefore, the trial court erred when it denied defendant's motion for summary disposition because there is no genuine issue of material fact that plaintiff lacked standing and was not the real party in interest related to the account receivable for Steen because plaintiff had assigned its rights to such to the servicing companies before it filed suit against defendant.